STATE OF CONNECTICUT *v.* HERMINIO
SOTOMAYOR
(AC 20518)

Zarella, Pellegrino and O'Connell, Js.

Argued September 21, 2000—officially released January 16, 2001

*Jeremiah Donovan*, with whom was *Rita Christopher*, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Joseph T. Corradino*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Herminio Sotomayor, appeals from the judgment of conviction, rendered after

a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] On appeal, the defendant claims that the trial court improperly (1) admitted into evidence for substantive purposes prior inconsistent written statements of a witness, (2) refused to instruct the jury on manslaughter in the second degree pursuant to General Statutes § 53a-56 (a) (1),[2] and (3) declined to instruct the jury that the use of a deadly weapon in some circumstances may be evidence of extreme indifference to human life pursuant to General Statutes § 53a-55 (a) (3).[3] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the late evening of October 10, 1989, sixteen year old Angel Lauriano and several friends were hurling eggs at passing vehicles on William Street in Bridgeport. At approximately 11 p.m., one of the eggs hit a passing vehicle. The driver, who later was identified as the defendant, immediately stopped and emerged from the vehicle armed with a rifle. The defendant chased the fleeing teenagers. Upon nearing Lauriano, the defendant

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-56 (a) provides in relevant part: "A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[3] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

shot the youth six times from behind. Lauriano died from multiple gunshot wounds.

Lauriano's murder remained unsolved until 1998. In April, 1998, Bridgeport police arrested the defendant's cousin, Manuel Arvelo, on an unrelated drug offense. While in custody, Arvelo asked to speak with a detective. Arvelo informed Detective Leonard Sattani of the Bridgeport police department that he had information about Lauriano's death and that his cousin, the defendant, had committed the murder. In a written statement dated April 13, 1998, Arvelo averred: "I saw my cousin stop and get out of his car with this rifle and chase this kid down and shoot him up. . . . I saw the kid bending down saying don't shoot me, he shot him, he emptied out the rifle on him, close range, I was right there." Arvelo gave a second statement on April 15, 1998, in which he reiterated much of the information that he had provided in his earlier statement. Arvelo swore to and signed each statement.

On April 17, 1998, Bridgeport police executed a warrant for the defendant's arrest. After waiving his rights to remain silent and to the assistance of counsel, the defendant gave a written statement in which he confessed to shooting Lauriano. The defendant recounted the incident as follows: "I was going down Noble [Avenue] to William [Street]. They started to throw eggs at my car, and it was dark at that time, I got out of the car and I was armed, I saw someone running and I went around this house and I saw this guy coming out and he ran toward me and I did not know if he had a gun, I reacted and I fired several shots. I ran back to the car." The defendant further stated that he fired about seven or eight shots.[4] Subsequently, the defendant was

---

[1] At trial, the defendant denied telling the police that he killed Lauriano. Notwithstanding the defendant's sworn and signed statement, he testified that he did not read the statement before signing it and that he signed it because he feared police retaliation.

charged with and convicted of Lauriano's murder.[5] This appeal followed.[6]

## I

The first issue we address is whether the court improperly admitted Arvelo's written statements into evidence for substantive purposes. The following additional facts and procedural history are relevant to our resolution of this claim.

At trial, Arvelo repudiated his April 13 and 15, 1998 statements.[7] He claimed not to recall the events of Octo-

---

[5] The defendant received an effective sentence of fifty years imprisonment.

[6] The defendant appealed from the judgment of conviction to our Supreme Court, which transferred the matter to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[7] Responding to the questions of the state's attorney, Arvelo testified in relevant part:

"Q. Mr. Arvelo, were you in the vicinity of Noble Avenue, William Street and Huntington Road on October the 10th of 1989?

"A. No.

* * *

"Q. Did you ever see someone throw an egg at your cousin Herminio Sotomayor's car in 1989?

"A. No.

* * *

"Q. On April the 13th of 1998, did you ever tell the police detective you were there to tell him about a shooting that took place in '89 or '90?

"A. Yes.

"Q. And did you also tell the police at this time I was there; it was my cousin Herminio Sotomayor?

"A. I don't remember that."

* * *

"Q. Did you ever tell the police I saw my cousin stop and get out of his car with this rifle?

"A. I don't recall.

* * *

"Q. Did you ever say that your cousin shot the kid because he hit his car with an egg?

"A. That's what I heard, hearsay, that some guy named Chino—

"Q. Did you ever say that?

"A. No.

* * *

"A. I'm a heroin addict, man. I can't remember a lot of stuff."

ber 10, 1989, because they were "[t]oo long ago." Although the state attempted to refresh Arvelo's memory by showing him his two written statements, he could remember only talking to Sattani "about something that [he] heard about somebody being killed." Arvelo attributed his lack of memory to his undergoing withdrawal from heroin at the time that he had given the statements. Nevertheless, Arvelo admitted to signing, without reading, each statement. He further testified that the police did not threaten, use force or promise help with the charges that were then pending against him to obtain his statements. He did claim, however, that the police paid him $20 for signing the April 15, 1998 statement.

On cross-examination by the defense, Arvelo testified that he gave the April 13, 1998 statement after being held for two days on an unrelated drug charge. He also contradicted his earlier testimony, claiming on cross-examination that he gave the April 15, 1998 statement after Sattani picked him up at his home, brought him to the police station and "threatened me if I wouldn't sign the rest, he would put me back in jail."

The state then called to the witness stand Sattani, the Bridgeport police detective who had taken each of Arvelo's statements. Sattani disputed Arvelo's recollection and testified as follows. On April 13, 1998, he received a call from the booking officer saying that an incarcerated individual wanted to speak with a detective. Sattani did not know Arvelo or why he wanted to talk to a detective. He also did not know Arvelo's status with respect to any pending charges. According to Sattani, Arvelo told him that "he had information regarding a homicide that occurred several years ago and that he was willing to talk to me about that."[8] Without inducement or promises from Sattani, Arvelo agreed to give a signed, sworn statement.

---

[8] Sattani testified that he was unaware of the Lauriano homicide at the time Arvelo gave his April 13, 1998 statement.

Sattani further testified that he asked Arvelo the questions and then typed Arvelo's responses.[9] According to Sattani, Arvelo then read and signed each page of the

[9] The April 13, 1998 statement provides in relevant part:
"Q. What is your education level?
"A. 10 grade then GED state.

\* \* \*

"Q. Have any promises or rewards been offered to you or have you been threatened in any way into making this statement?
"A. No.

\* \* \*

"Q. At this time, do you waive your rights and are you willing to talk to me, understanding that you do not have to and that I am a sworn police officer?
"A. Yes.
"Q. What do you have to tell me?
"A. I am here to tell you about a shooting that took place back in '89 or '90, I was there, it was my cousin Herminio Sotomayor. He was driving his car and I was following him.

\* \* \*

"Q. What happened?
"A. We were right there on William, I did not know what was going on, I saw my cousin stop and get out of his car with this rifle and chase this kid down and shoot him up.
"Q. Did you see your cousin shoot this kid?
"A. Yes, I was right there, I saw the kid bending down saying don't shoot me, he shot him, he emptied the rifle on him, close range, I was right there.

\* \* \*

"Q. Why did your cousin shoot this kid?
"A. Because he hit his car with an egg.
"Q. Did you know the victim?
"A. Yes. I knew him, I went out with his sister.
"Q. What was the name of the victim?
"A. Angel, they called him Mimo. They put that on the wall across from the funeral parlor in his memory.

\* \* \*

"Q. Have you seen your cousin with that gun after the shooting?
"A. Yes, he still carried it, the cops took the gun from 777 Ogden Street, a red house . . . because this kid John shot out a light and the cops took the guns and said that if you want them back to come to the police department.
"Q. Did your cousin ever get the rifle back?
"A. He never went to pick it up. John did not get his either, he was scared.
"Q. Why was John scared?
"A. Because he knew the gun had a body.
"Q. When you say he knew the gun had a body, do you mean that he knew that your cousin shot and killed the kid with one of the guns taken

written statement. Sattani testified that Arvelo also acknowledged the truth of the statement.[10] Sattani recalled that Arvelo did not exhibit difficulty in reading the statement and that he did not ask any questions about its contents or want to correct the statement in any way.

On cross-examination by the defense, Sattani admitted that he did not know how long Arvelo had been at the station before speaking with him. When asked whether he could recognize an individual experiencing narcotics withdrawal, Sattani answered that he could and that Arvelo neither appeared to be under the influence of narcotics nor exhibited symptoms of withdrawal.

Following Sattani's cross-examination, the court excused the jury and, thereafter, held a hearing on the admissibility of Arvelo's April 13, 1998 written statement for substantive purposes. The defense did not dispute that Arvelo signed and swore to the statement. Instead, the defendant argued, as he does before this court, that the circumstances at the time Arvelo gave

by the police?

"A. Yes.

"Q. Do you remember what month of the year the shooting took place?

"A. It was October, before Halloween, it was at night, it was dark at the time.

"Q. You said it was dark at the time of the shooting, did you get a good view?

"A. I seen him shoot him, there were lights from the funeral home.

\* \* \*

"Q. Why are you talking to the police now about this?

"A. Because I feel he should pay for this, I am paying for this shit know that's bullshit, the kid was a good kid.

\* \* \*

"Q. After reading this statement and finding it to be true as you have told me, will you sign it?

"A. Yes."

[10] Sattani testified that Detective Gill Del Valle of the Bridgeport police department was present when Arvelo signed the April 13, 1998 statement, and that Del Valle administered the oath to Arvelo.

the statement, coupled with the fact that the events discussed therein took place at least nine years earlier, evidenced the inherent untrustworthiness of the information it contained. The state countered that *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), contemplated the present situation, namely, a witness on the stand repudiating his prior inconsistent written statement, and that the statements should be admitted for substantive purposes because each satisfies the four criteria for admissibility under *Whelan*.[11]

The court found, inter alia, that Arvelo volunteered the information without suggestion from Sattani or any other officer and that Arvelo was not undergoing narcotics withdrawal at the time he gave the statement. The court further noted that although Arvelo claimed to be experiencing heroin withdrawal as he was testifying, "[h]e picked and chose what he was going to answer; which he would agree was in the statement; which he said was not accurate; his thought process while stating that he was at the present time undergoing withdrawal; was unimpaired as far as I could determine from making select[ive] decisions about the statement he had given." Over the defendant's objection, the court admitted Arvelo's April 13, 1998 statement for substantive purposes.

In the presence of the jury, the state further questioned Sattani about Arvelo's April 15, 1998 statement. According to Sattani, Arvelo returned to the detective bureau on April 15, 1998, of his own accord and gave

---

[11] Under *Whelan*, a prior inconsistent statement may be admitted into evidence for substantive purposes if it is in writing and signed by the declarant, who has personal knowledge of the facts stated, and the declarant testifies at trial and is subject to cross-examination. *State* v. *Whelan*, supra, 200 Conn. 753.

a second statement regarding the Lauriano killing.[12] In recording Arvelo's second statement, Sattani followed the same procedures that he had used to transcribe the first statement. Sattani further testified that although he did not make any threats against or promises to Arvelo, another Bridgeport police officer gave Arvelo $20 because Arvelo claimed to need it for his children. Sattani emphatically denied that he and Arvelo discussed the $20 prior to taking the second statement or that Arvelo was given the money in exchange for his testimony. Over the defendant's objection, the court admitted Arvelo's April 15, 1998 statement pursuant to *State* v. *Whelan,* supra, 200 Conn. 743.[13]

While the defendant does not dispute that Arvelo swore to and signed the two statements, he argues, instead, that the circumstances giving rise to the statements lack the necessary indicia of reliability for admis-

---

[12] The April 15, 1998 statement provides in relevant part:

"Q. Do you remember me taking a statement from you about two days ago?

"A. Yes.

"Q. There are a few things I would like to ask you, would you mind answering a few more questions?

"A. No, I don't mind.

"Q. Were you treated fairly by me before?

"A. Yes.

"Q. In regard to the homicide we spoke of, do you remember telling me that your cousin Sotomayor did the shooting back in October of 1989?

"A. Yes.

"Q. Did you tell me that he shot and killed Angel who was known as Mimo?

"A. Yes.

\* \* \*

"Q. Is there anything else you could add that might help us in this case?

"A. I can't think of nothing else right now.

"Q. Will you make yourself available to us in the future if we need to speak with you?

"A. Yes.

"Q. After reading this statement and finding it to be true as you have told me, will you sign it?

"A. Yes."

[13] The court admitted Arvelo's second statement on the same grounds under *Whelan* as those on which his April 13, 1998 statement was admitted.

sion under the *Whelan* doctrine, and, thus, the court improperly admitted the statements into evidence for substantive purposes. The defendant calls our attention to the fact that the information contained in Arvelo's statements pertained to events occurring approximately nine years earlier. He also points to Arvelo's testimony that he was experiencing heroin withdrawal symptoms when he had given the statements. The defendant further highlights the facts that Arvelo was in custody when he gave the first statement and that Arvelo received $20 from the Bridgeport police after he signed the second statement.

The defendant contends that, regardless of whether the prior inconsistent statements meet the safeguards mandated in *Whelan*, a written and signed statement from a witness who is being held on pending criminal charges should not be admitted into evidence for substantive purposes.[14] The state argues, on the other hand, that Arvelo's two written statements meet the *Whelan* criteria and, therefore, that the court properly admitted the statements for substantive purposes. We agree with the state.

Under *State* v. *Whelan*, supra, 200 Conn. 753, a prior inconsistent statement may be admitted into evidence for substantive purposes where (1) the statement is in writing, (2) the statement is signed by the declarant, (3) the declarant has personal knowledge of the facts contained therein and (4) the declarant testifies at trial and is subject to cross-examination. Our Supreme Court recently reiterated in *State* v. *Mukhtaar*, 253 Conn. 280, 305–306, 750 A.2d 1059 (2000), that the admissibility of a prior inconsistent statement depends on the satisfaction of these four requirements.

---

[14] At oral argument before this court, the defendant narrowed his claim, arguing only that the declarant's condition of experiencing narcotics withdrawal makes his statements to the police so unreliable that the trial court, as the gatekeeper, should have excluded them.

"A *Whelan* claim is evidentiary in nature and, accordingly, the defendant bears the burden of establishing that the trial court's erroneous ruling was harmful to him in that it probably affected the outcome of the trial." (Internal quotation marks omitted.) *State* v. *Robinson*, 56 Conn. App. 794, 798, 746 A.2d 210, cert. denied, 253 Conn. 904, 753 A.2d 938 (2000). The admissibility of a prior inconsistent statement under *Whelan* "is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Citation omitted.) *State* v. *Newsome*, 238 Conn. 588, 596, 682 A.2d 972 (1996).

"As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true *in fact.* But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus, as with all other admissible nonhearsay evidence, we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances. Consequently, once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan,* that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible.

"Of course, a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the state-

ment does not go to the jury for substantive purposes. We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process.[15] In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill.[16] Thus, because the requirements that we established in *Whelan* provide a significant assurance of reliability, it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." (Emphasis in original.) *State* v. *Mukhtaar*, supra, 253 Conn. 306–307.[17]

The defendant must concede that Arvelo's statements satisfy three of the four *Whelan* requirements: (1) Arvelo's prior inconsistent statements were in writing;

[15] "Of course, the trial court's factual findings on this issue will not be disturbed on appeal unless they are clearly erroneous." *State* v. *Mukhtaar*, supra, 253 Conn 307 n.26.

[16] "[T]he *Whelan* criteria, particularly cross-examination, provide substantial assurance of reliability. The witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of face, whether forgetfulness, carelessness, pity, terror or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. It is hard to escape the view that evidence of a prior inconsistent statement when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony. 2 C. McCormick, Evidence [4th Ed. 1992] § 251, p. 120." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 305 n.25.

[17] Although our Supreme Court decided *State* v. *Mukhtaar*, supra, 253 Conn. 280, after the parties filed their briefs in this case, the defendant was aware of *Mukhtaar* and, in fact, substantially based his oral argument to this court on the decision.

(2) Arvelo signed the statements; and (3) Arvelo testified and was subject to cross-examination at trial. Notwithstanding Arvelo's testimony that he did not have personal knowledge of the facts contained in his statements, the court found that Arvelo signed and swore to the truth of the statements. See *State* v. *McDougal*, 241 Conn. 502, 510, 699 A.2d 872 (1997) (statement signed under oath after declarant advised that it is crime to give false statement provides significant assurance of statement's accuracy); *State* v. *Newsome*, supra, 238 Conn. 600 (signed and sworn out-of-court statement has added assurance of reliability because, if untrue, declarant may face prosecution for giving false statement to police). Moreover, the court noted that Arvelo provided details of the shooting without suggestion from the interviewing officer and that the testimony of Marshall Robinson, a ballistics expert, corroborated much of the information provided. These findings are supported by the evidence and, therefore, are not clearly erroneous.

The court's implicit finding that the circumstances surrounding Arvelo's statements did not warrant withholding the statements from the jury was not an abuse of its wide discretion in such matters. The transcript of the proceedings shows that Arvelo initiated contact with the detective bureau of the Bridgeport police department and volunteered information about the Lauriano homicide, despite being in custody on an unrelated charge. Although the testimony conflicted regarding the $20 that a police officer gave to Arvelo after he signed and swore to his second statement, Arvelo testified that the police did not threaten or promise him anything in exchange for either of his statements. These circumstances are not so unduly coercive or extreme as to undermine grievously the reliability of Arvelo's statements.

Lastly, whether Arvelo was under the influence of narcotics, experiencing narcotics withdrawal or felt pressured by the police to give each of his statements "were relevant and proper matters for cross-examination . . . [that] go to the weight of the evidence and not its admissibility." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 308. We accordingly conclude that the court properly admitted into evidence Arvelo's prior inconsistent statements for substantive purposes.[18]

II

The defendant next claims that while the court instructed the jury on murder and, as the defense requested, manslaughter in the first degree, it improperly refused the defendant's request to instruct the jury on the lesser included offense of manslaughter in the second degree. The defendant argues that this denial constitutes reversible error. We disagree.

Section 53a-54a (a) provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." Whether the defendant was entitled to a jury instruction on a lesser included offense of murder depends on whether the defendant satisfied the requirements of *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980).

A defendant does not have a "fundamental constitutional right to a jury instruction on every lesser included offense . . . rather, the right to such an instruction is purely a matter of our common law." (Citation omitted; internal quotation marks omitted.) *State* v. *Dupree*, 56 Conn. App. 631, 642, 745 A.2d 832, cert. denied, 252

---

[18] In so deciding, we decline the defendant's invitation to establish a per se rule that a prior inconsistent statement from a witness who is being held on pending criminal charges should not be admitted for substantive purposes under *Whelan*.

Conn. 952, 749 A.2d 1203 (2000). Under *Whistnant*, "[a] defendant is entitled to an instruction on a lesser offense if, and only if . . . (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." (Internal quotation marks omitted.) *State* v. *Preston*, 248 Conn. 472, 476, 728 A.2d 1087 (1999), quoting *State* v. *Whistnant*, supra, 179 Conn. 588; see also *State* v. *Dupree*, supra, 642.

For the third and fourth requirements of *Whistnant* to be satisfied, "there must be *sufficient* evidence, introduced by either the state or the defendant, or by a combination of their proofs, to justify a finding of guilt of the lesser offense." (Emphasis in original; internal quotation marks omitted.) *State* v. *Crafts*, 226 Conn. 237, 251, 627 A.2d 877 (1993). In viewing the evidence in the light most favorable to the defendant; *State* v. *Gebeau*, 55 Conn. App. 795, 798, 740 A.2d 906 (1999), cert. denied, 252 Conn. 922, 747 A.2d 519 (2000); we conclude that there was insufficient evidence presented to justify a finding of guilty of manslaughter in the second degree and, therefore, that the defendant was not entitled to an instruction on that lesser included offense.[19]

---

[19] Because we decide that the defendant has failed to satisfy the third and fourth requirements under *Whistnant*, we do not address the state's argument that the defendant also failed to satisfy the other two requirements.

The requisite state of mind distinguishes murder from manslaughter in the first or second degree. The offense of murder requires that the defendant intentionally cause the death of another; General Statutes § 53a-54a (a); while the offense of manslaughter in the first or second degree requires the lesser state of mind of recklessness. General Statutes §§ 53a-55 (a) (3) and 53a-56 (a) (1).

What distinguishes manslaughter in the first degree from manslaughter in the second degree is the defendant's level of recklessness that the state must prove to obtain a conviction. Under § 53a-55 (a), "[a] person is guilty of manslaughter in the first degree when . . . (3) . . . he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." Moreover, manslaughter in the first degree requires that the defendant have acted "under circumstances evincing an extreme indifference to human life . . . ." General Statutes § 53a-55 (a) (3). The offense of manslaughter in the second degree, by contrast, requires that the defendant merely acted recklessly and that such reckless conduct caused the death of another person. General Statutes § 53a-56 (a) (1).

At trial, the defendant made a written request, pursuant to Practice Book § 42-16 et seq., to charge the jury on manslaughter in the first and second degrees. Notwithstanding that the defendant testified in his own defense and denied shooting Lauriano, the defendant offered as the sole factual basis for his request to charge both lesser included offenses his earlier statement to the police[20] that "I saw someone running and I went

---

[20] The defendant's sworn and signed, written statement to the police was introduced into evidence. The statement provides in relevant part:

"Q. Do you know what you are being charged with?

"A. They say murder.

\* \* \*

"Q. You are being charged with a crime, do you remember what happened and when it occurred?

around this house and I saw this guy coming out and he ran toward me and I did not know if he had a gun, I reacted and fired several shots."

The defendant hypothesizes in his appellate brief that if the instruction had been given, the jury could have determined that the defendant's conduct resulted from an outburst of anger over having an egg thrown at his vehicle rather than from conduct evincing an indifference to human life. The defendant further contends that it was equally possible for the jury to determine that he shot at what he believed to be empty space and thereby hit Lauriano who was running away.

Our Supreme Court has "expressly rejected the proposition that a defendant is entitled to instructions on lesser included charges based on merely theoretical or possible scenarios." *State* v. *Crafts*, supra, 226 Conn. 251; *State* v. *Rasmussen*, 225 Conn. 55, 66–67, 621 A.2d

---

"A. In 1989, I was going down Noble Avenue to William Street. They started to throw eggs at my car, and it was dark at that time, I got out of my car and I was armed, I saw someone running and I went around this house and I saw this guy coming out and he ran toward me and I did not know if he had a gun, I reacted and I fired several shots. I ran back to the car.
"Q. How many shots did you fire?
"A. About seven or eight, it was something quick.
    \* \* \*
"Q. What kind of gun did you have?
"A. A rifle, a .22 rifle.
"Q. How many bullets did you have in the gun?
"A. I don't remember.
"Q. How many bullets did the gun hold?
"A. 14 shots.
    \* \* \*
"Q. What did you do with the .22 rifle?
"A. I left it at John's house at 777 Ogden Street.
    \* \* \*
"Q. What ever happened to that .22 rifle?
"A. The police took it from John's house, John shot at a pole, I think he was trying to shoot out the light.
"Q. Did you ever go to the police department to get the rifle back?
"A. No, I don't know where it is."

728 (1993). The defendant's argument rests solely on his statement to the police disavowing the charges and the attendant assumption that his conduct was merely reckless. Yet, the defendant's statement was inextricably linked to overwhelming evidence showing that he chased Lauriano and shot him at close range, and that Lauriano was shot six times from behind. Moreover, there was no evidence introduced at trial indicating that Lauriano had in his possession a firearm or any other weapon on the night that he died.

At trial, Malka Shah, an associate medical examiner with the state, testified that "[t]here were no entry wounds found on the front of [Lauriano's] body" and that "[a]ll entry wounds were found in the back of the deceased person." She further testified that she retrieved several bullets from Lauriano's body during the autopsy examination. Robinson, who examined the shell casings found at the scene and the bullets retrieved from Lauriano's body, testified that such casings and bullets were fired from a .22 rifle. Robinson's testimony was consistent with the defendant's statement that he shot the victim with "[a] rifle, a .22 rifle." Rather than demonstrating guilt of the lesser included offense of manslaughter in the second degree, as required under the fourth requirement of *Whistnant*, the defendant's statement, in conjunction with the other evidence, demonstrates that the defendant engaged in conduct that created "a grave risk of death to another person . . . ." General Statutes § 53a-55 (a) (3).

We conclude that the court properly determined that the evidence was insufficient to justify a finding of guilty of manslaughter in the second degree. We further conclude that the court acted properly when it denied the defendant's request to instruct the jury on manslaughter in the second degree.

## III

The defendant's final claim is that the court improperly declined to instruct the jury that, in certain circumstances, the use of a deadly weapon could evince an extreme indifference to human life. The state argues in response that the decision to comment on the evidence, when charging the jury, is within the discretion of the trial court and that the court did not abuse its discretion in this instance.

"Our standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rule of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 714, 756 A.2d 799 (2000). Therefore, "[t]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly represents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [J]ury instructions need not be exhaustive, perfect, or technically accurate. Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Internal quotation marks omitted.) *State* v. *Taft*, 57 Conn. App. 19, 29, 746 A.2d 813, cert. granted on other grounds, 253 Conn. 909, 753 A.2d 942 (2000).

The following additional facts are relevant to our resolution of this issue. The court prefaced its instructions to the jury by cautioning that "[i]f I refer to any evidence in this case, and I will during the course of this instruction, it will be for the purpose of illustration and clarification. You are not to understand that I intend to emphasize any evidence. And the evidence that I mention is not to be highlighted by you." Thereafter, when defining the elements of murder, the court explained in relevant part: "An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wounds inflicted and the events leading to and immediately following the death. One who uses a deadly weapon upon the vital parts of another will be deemed to have intended the probable result of that act. And from such circumstances a proper inference may be drawn, in some cases, that there was an intent to kill." The court did not explain, however, that the use of a deadly weapon also may evince extreme indifference to human life when it instructed the jury on manslaughter in the first degree.[21]

Shortly after retiring to the deliberation room, the jury sought a clarification of the elements of murder and manslaughter. The court reinstructed the jury in the same manner as it did with its original instruction. The court reiterated its instruction on the element of intent, explaining that "[t]he intent to commit murder, as we indicated, may be inferred from the circumstan-

---

[21] The court instructed the jury on manslaughter in the first degree substantially in accordance with the defendant's requested charge. The court charged, in part, that "the state must prove beyond a reasonable doubt that . . . the circumstances of the defendant's conduct demonstrated an extreme indifference to human life. The phrase extreme indifference to human life has its ordinary meaning. Mere callousness is not enough nor is ordinary recklessness sufficient to constitute demonstrating extreme indifference to human life. The law requires circumstances demonstrating the defendant's extreme indifference to human life."

tial evidence such as the type of weapon used, the manner in which it was used, the type of wounds inflicted and the events leading up to and immediately following the death of Lauriano. One who uses a deadly weapon upon the vital part of another will be deemed to have intended the probable result of that act and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill."

The defendant objected to the court's original instruction. The defendant argued that "the court should not direct the jury to find that in some cases that they can infer an intention to kill by the use of a deadly weapon." The defendant also objected to the court's reinstruction on the element of intent.

The defendant argues to this court that although the use of a deadly weapon is not material to whether the charge is murder or manslaughter in the first degree, "[w]hat is material is the intent that such use demonstrates." The defendant further argues that because the court instructed the jury that the use of a deadly weapon may be evidence of specific intent in the murder charge, it also should have instructed the jury that such use may be considered evidence of an extreme indifference to human life under the manslaughter in the first degree charge.[22]

We agree with the defendant insofar as the use of a deadly weapon is immaterial to whether the charge is murder or manslaughter in the first degree. We disagree, however, that the facts of this case required the judge to charge in accordance with the defendant's request that the use of a deadly weapon could be evidence of

---

[22] The defendant's claim is not that the court improperly instructed the jury on an element of murder or manslaughter in the first degree. Rather, the defendant argues that the court improperly refused to instruct the jury that it could also infer from the defendant's use of a deadly weapon that he acted with extreme indifference to human life.

an extreme indifference to human life. The objective evidence in this case shows that Lauriano was shot six times from behind and that he died from these gunshot wounds. Moreover, there was no evidence of any frontal entry wounds. Therefore, under the circumstances of this case, the instruction fairly represented the case to the jury so that injustice was not done to either party. We conclude that the court did not abuse its discretion by refusing to give the requested instruction.

We next inquire whether there is a reasonable probability that the instruction as a whole misled the jury. We conclude that the instruction did not mislead the jury, especially in light of the court's lengthy explanation of the meaning of recklessness in the context of manslaughter in the first degree.

The court explained that to find the defendant guilty of manslaughter in the first degree, the jury must find that the state proved beyond a reasonable doubt that the defendant "recklessly engaged in conduct which created a grave risk of death to another person." The court further stated that "[t]he defendant's conduct then must have created a grave risk of death to another and the defendant's conduct must have been reckless. A person acts recklessly with respect to a result or to a circumstance described by statute defining an offense when he is aware of and consciously disregards a substantial, unjustifiable risk that such result will occur or that such a circumstance exists. . . . In other words, recklessness involves a subjective realization of a risk and a conscious decision to ignore it. The risk must be substantial and unjustifiable."

The court continued: "There must be a great or substantial difference between, on the one hand, the defendant's conduct in disregarding a substantial and unjustifiable risk and, on the other hand, what a reasonable person would have done or could have done under

the circumstances. The risk that the defendant disregarded must be substantial and unjustifiable. Whether a risk is substantial and unjustifiable is a question of fact for you to determine. You must decide whether the state has proven that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk such that the circumstances under which he acted evidenced an extreme indifference to human life."

In its reinstruction to the jury, the court again discussed at length each of the elements of manslaughter in the first degree. In explaining the reasonable person standard in the context of the element of recklessness, the court reiterated, in part, that "[y]ou must determine the question of reasonable care by placing an ordinary, prudent person in the situation and the circumstances in which the defendant found himself and then ask yourselves what would a reasonably prudent person have done or not have done in such a situation and under such circumstances. . . . This is a question of fact for you to determine. All [of] the circumstances as you find them to be are to be considered . . . . That is, [the defendant's] statement which he's asking you to consider . . . together with any and all other evidence bearing on his conduct at that time as has been testified to by other witnesses in the case."

In viewing the court's instruction to the jury in its entirety, we conclude that the instruction correctly stated the law and sufficiently guided the jury in arriving at a proper verdict. Moreover, whether the court should have commented on the evidence, as the defendant argues, "is largely a matter within its sound discretion." (Internal quotation marks omitted.) *Bushy* v. *Forster*, 243 Conn. 596, 599, 706 A.2d 8 (1998).

The judgment is affirmed.

In this opinion the other judges concurred.