## STATE OF CONNECTICUT *v.* TERRELL WATKINS
### (AC 21674)

Mihalakos, Dranginis and West, Js.

Submitted on briefs June 11—officially released October 8, 2002

*William A. Snider* filed a brief for the appellant (defendant).

*James E. Thomas*, state's attorney, *Thomas R. Garcia* and *Ronald G. Weller*, assistant state's attorneys, and *Joseph J. Hurley*, deputy assistant state's attorney, filed a brief for the appellee (state).

*Opinion*

WEST, J. The defendant, Terrell Watkins, appeals from the judgments of conviction, rendered after a jury trial, of three counts each of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-48 (a), and robbery in the second degree in violation of General Statutes § 53a-135 (a) (1). The defendant was sentenced on November 7, 2000, to a total effective term of thirty years in the custody of the commissioner of correction, execution suspended after twelve years, with five years probation.

On appeal, the defendant claims (1) that the court improperly admitted the written statements of a state witness pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (2) that the jury's verdict was against the weight of the evidence. We disagree and affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On October 27, 1999, at approximately 12:30 a.m., one of the defendant's victims, Tywan Williams, was walking on East Street in the direction of Seyms Street in Hartford. A silver colored car with tinted windows stopped and parked at the corner of East and Seyms streets. As Williams passed the car, he noticed a silver colored or chrome colored gun being pointed out of the passenger's side of the car in his direction.[1] Williams observed three individuals in the car, one of whom demanded his money. At that point, Williams dropped a bag that he was carrying and fled along East Street. The victim witnessed one of the occupants of the car take the bag. The car then was driven away in the direction of Main Street.

On October 27, 1999, at approximately 1:40 a.m., Victoria Mercado and Raymond Nieves were walking along Farmington Avenue in the direction of Owen Street. As they arrived at the intersection of Farmington Avenue and Owen Street, two black males got out of a gray Honda CRX that had been parked on the street, approached and ordered Mercado and Nieves to the ground. One of the males was wearing a black hooded sweatshirt and a mask, and the other male was wearing a camouflage army jacket. The two men pushed the victims to the ground, whereupon one of the assailants started kicking Nieves and searching his pockets. The second assailant took Mercado's book bag from her and searched her pockets as well. The book bag contained a compact disc player, a pager, shoes, a passport, a binder and some money. The assailants then entered the Honda that was waiting for them on Farmington Avenue and drove along Farmington Avenue toward downtown Hartford.

---

[1] The witnesses testified variously that the gun was silver colored, chrome colored or gray. The testimony established, however, that the witnesses were using those adjectives synonymously.

In the early morning hours of October 28, 1999, Carlos Colon had stopped at a Sunoco station at the corner of Wethersfield Avenue and Eaton Street in Hartford. As he was walking back to his vehicle, two men approached him. One of the men was wearing a camouflage style army jacket, and the second man was wearing a dark hooded sweatshirt. Both men were wearing masks. The men demanded Colon's money. One of the assailants placed a silver colored gun at Colon's ribs. After going through Colon's pockets, the assailants retrieved $19 as well as Colon's wallet. When Colon refused to accede to the assailant's demand for his car, he was struck from behind with a metal object. The assailants then ran.

On October 28, 1999, between 2:30 and 3 a.m., a Bloomfield police officer, Michael Guglietta, observed a gray Honda CRX fitting the description of a vehicle that had been involved in some robberies in Hartford and in Bloomfield. After the officer observed the vehicle turn right into the path of another vehicle, he stopped the Honda. Guglietta testified that the operator appeared hesitant to stop. After the officer drove vehicle behind the Honda and signaled it to stop, the vehicle continued to travel one-half mile, swerving from the left to the right before stopping. The vehicle was operated by Sandy Nealey. The defendant and Givon Iverson[2] were passengers in the vehicle. At the time that the vehicle was stopped, the defendant was wearing a camouflage, army style jacket. The three individuals in the vehicle were placed under arrest on various charges and taken to the Bloomfield police department. The vehicle was towed to a private garage, which was used regularly by the Bloomfield police department. The owner of the vehicle, Anthony Waite, gave the Hartford police permission to conduct a search of the vehicle.

---

[2] Although Iverson identified himself to the police as James Price, he later was identified correctly through fingerprint matching.

The search revealed a portable compact disc player and discs, a beeper and a wallet later identified by the respective victims as the property that had been stolen from them. Also recovered were a black hood, a nylon stocking cap with two eyeholes cut out of it and a hooded sweatshirt. In addition to those items seized from the vehicle itself, the Hartford police also retrieved, from the Bloomfield police department property room, the camouflage coat that the defendant had been wearing at the time of his arrest.

I

We first address the claim that the court improperly admitted a witness' prior inconsistent statement into evidence for substantive purposes. We disagree with the defendant that the statement was admitted improperly.

The following additional facts are relevant to our disposition of the defendant's claim. On two separate occasions, October 28 and November 1, 1999, Nealey provided written, signed statements to the police in which he provided details of the robberies.[3] At trial,

---

[3] Nealey's two statements were redacted prior to being presented to the jury. As read to the jury by the court clerk, the first statement in relevant part was as follows: "[October 28, 1999]. I was arrested today in Bloomfield, Connecticut. The police arrested me for operating without a license, misuse of plates. . . . I was arrested with two other guys. Their names are Terrell Watkins and James Price. The Bloomfield police told me that the car we were driving in was used in some robberies. Detectives [Stephen] Grabowski and [Robert] Dionne from the Hartford police department came to the Bloomfield police department to ask me about some robberies. They read me my rights.

"I told them that we did . . . robberies this morning. The first one was on [Seyms] Street in Hartford. . . . Then we went to Wethersfield Avenue also this morning. I was driving the car, Terrell and James were holding up the people. The people were drug fiends who were being held up, some of them. . . .

"We talked about . . . the robberies, that's why we were driving around. To rob people. I just started doing this last night. . . . They asked me if I wanted to do this and I said yes. . . .

"We went to Owen Street. James was driving, I was in the back. Terrell was passenger, Terrell and James got out. Terrell had the chrome color gun, and they robbed some dude. I stayed in the car for that one, too. Then

Nealey recanted those statements, testifying that he was not present during the robberies and that he could not remember what he had said in his statements. After being shown his signed, written statements in an effort to refresh his memory, Nealey conceded that the statements were his and that he had signed the statements. He claimed, however, that the police had pressured him into making those statements and that the information concerning the incidents had been supplied to him by Detective Stephen Grabowski.[4] Nealey conceded that he nevertheless understood that if he made a false statement, he would be in violation of the law.

we went back to Adams Street. . . .

"This morning we did . . . Wethersfield Avenue . . . the one robbery on Wethersfield Avenue was way up the street. I never got any money for these robberies, I was only the driver. I got the car from a dude named Oscar, from Sharon Street. The statement was read to me by Detective Grabowski. Everything is true."

The second statement was provided to the police on November 1, 1999. As redacted and presented to the jury, it reads in relevant part: "The first day it all happened, they came to my house and they wanted me to drive the car so that they could rob people, so I said OK. We were at my house at the time, so I got in the back.

"The first place we went was to [Seyms] Street, Givon was driving, I was in the backseat. The car stopped, Givon and Terrell got out of the car and ran a couple houses up to the victim. The victim ran, dropped his bag and Terrell picked the bag up.

"After that John drove back to the block, we stayed there for a hot minute, then we got back into the car. . . . We then went to Farmington Avenue and Owen Street. John parked at the corner, behind a couple cars. . . . They both got out, turned around the corner, off Owen, they were gone for a hot minute so I then hopped to the driver's seat and I pulled up to where I could look up Owen Street. They were coming back already.

"So, I pulled off and went straight to Adams Street. We all got out, I went to the backyard to take a leak. From the yard we were in, Givon drove me home. . . .

"I parked on Baltimore Street, we stayed there for about fifteen minutes, then I said, 'I'm about to drive home.' So, I drove up Blue Hills Avenue, down Cottage Grove Road, and that's when I got pulled over. . . . I, Sandy Nealey, wrote this statement."

[4] On redirect examination, the declarant stated that although certain portions of the statement had been "fed" to him by the detectives, information concerning two other crimes had been supplied by him.

The state then offered the two written statements as substantive evidence, pursuant to the exception to the hearsay rule set forth in *State* v. *Whelan*, supra, 200 Conn. 753. The defendant objected, claiming that the statement did not satisfy the criteria for admissibility because the declarant disavowed personal knowledge of the information contained in the statement.

"The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Citation omitted.) *State* v. *Newsome*, 238 Conn. 588, 596, 682 A.2d 972 (1996).

Under *Whelan*, a prior inconsistent statement may be admitted into evidence for substantive purposes where (1) the statement is in writing, (2) the statement is signed by the declarant, (3) the declarant has personal knowledge of the facts contained therein and (4) the declarant testifies at trial and is subject to cross-examination. *State* v. *Whelan*, supra, 200 Conn. 753. The admissibility of a prior inconsistent statement depends on the satisfaction of those four requirements. *State* v. *Mukhtaar*, 253 Conn. 280, 305–306, 750 A.2d 1059 (2000).

"As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true *in fact.* But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus, as with all other admissible nonhearsay evidence, we allow the fact finder to determine whether the hearsay statement is credible upon consideration

of all the relevant circumstances. Consequently, once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible." (Emphasis in original; internal quotation marks omitted.) *State* v. *Sotomayor*, 61 Conn. App. 364, 375, 765 A.2d 1 (2001), appeal dismissed, 260 Conn. 179, 794 A.2d 996, cert. denied, 537 U.S. 922, 123 S. Ct. 313, 154 L. Ed. 2d 212 (2002).

The defendant concedes that the admitted statements satisfy three of the four *Whelan* criteria. The statements are in writing, the declarant signed the statements, and he testified and was subject to cross-examination at trial. The defendant argues, however, that the statements fail to satisfy the requirement that the declarant have personal knowledge of the events described therein.

We are not persuaded that the circumstances in this case differ in any significant manner from the generally prevailing situation in which a declarant denies the truthfulness of an earlier statement. The declarant in the present case was on the witness stand before the jury, and the jury had sufficient opportunity to weigh the credibility of his testimony against that of his written statements. "[W]hen the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. . . . The jury can, therefore, determine whether to

believe the present testimony, the prior statement, or neither. . . . Quite simply, when the declarant is in court, under oath, and subject to cross-examination before the factfinder concerning both his out-of-court and in-court statements, the usual dangers of hearsay are largely nonexistent." (Internal quotation marks omitted.) *State* v. *Grant*, 221 Conn. 93, 98–99, 602 A.2d 581 (1992).

Allowing a party to circumvent the exception to the hearsay rule established by *Whelan* merely by repudiating the foundation for his knowledge when that foundation is an element of the statement itself would eviscerate the *Whelan* exception, potentially leaving no statement admissible under the pertinent rule. "[T]he defendant's claim that the . . . statement was unreliable because the witness, at trial, repudiated the statement is without merit. That the witness repudiated his earlier statement merely demonstrates that his statements were indeed inconsistent with his trial testimony." *State* v. *Woodson*, 227 Conn. 1, 21, 629 A.2d 386 (1993).

In *Sotomayor*, we confronted a similar situation in which the declarant recanted his sworn and signed statement, and testified at trial that he did not have personal knowledge of the facts contained in the statement. In that case, we concluded that the statement was admitted properly notwithstanding that the declarant disputed on the witness stand that he had personal knowledge of the events described in his statement. *State* v. *Sotomayor*, supra, 61 Conn. App. 377–78. In evaluating whether a declarant has personal knowledge of the facts contained within a prior inconsistent statement, we look to the statement itself. If the statement itself indicates that the basis of the information contained in that statement is the declarant's personal knowledge, that is sufficient to satisfy the criteria of personal knowledge established by *Whelan*. *State* v.

*Estrada,* 26 Conn. App. 641, 657, 603 A.2d 1179 ("to determine whether the declarant has the requisite personal knowledge we look to the statement itself . . . and consider whether the statement indicates that the declarant personally knew the truth of the contents of the statement" [citations omitted]), cert. denied, 221 Conn. 923, 608 A.2d 688 (1992).

The fact that the declarant claimed on the witness stand that he was pressured by the police into providing the written statements also does not preclude their admissibility for substantive purposes. "[A]ssertions that [the witness] . . . felt pressured by the police to make . . . the statement [are] relevant and proper matters for cross-examination . . . [that] go to the weight of the evidence and not its admissibility." (Internal quotation marks omitted.) *State* v. *Mukhtaar,* supra, 253 Conn. 308. "Of course, a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill. Thus, because the requirements that we established in *Whelan* provide a significant assur-

ance of reliability, it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." Id., 306–307.

We conclude, therefore, that the circumstances surrounding the making of the statements provided sufficient indicia of their reliability to warrant their admission into evidence pursuant to *Whelan*. Accordingly, we conclude that the court did not abuse its discretion by allowing into evidence Nealey's prior inconsistent statements for substantive purposes.

## II

We turn now to the defendant's claim that the jury's verdict was against the weight of the evidence. We disagree.

In reviewing the sufficiency of the evidence to support a criminal conviction, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the [finding of guilt]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Hall*, 66 Conn. App. 740, 744–45, 786 A.2d 466 (2001), cert. denied, 259 Conn. 906, 789 A.2d 996 (2002).

The main argument presented in support of the defendant's claim appears to be that the jury failed to accord the proper weight to his alibi. Tamara Reid testified that the defendant was at her house on the night of the robberies. The defendant argues that there was no evidence that he attempted to fabricate that alibi. The

state, however, need not produce evidence of fabrication.[5] It is the exclusive province of the jury to determine the credibility of witnesses. Although the state retains the burden to prove each element of the crimes charged, it need not offer evidence directly showing that the alibi was fabricated. It is sufficient if, by the introduction of evidence inconsistent with the proffered alibi, the prosecution is able to establish the factual predicates necessary to support a conviction. The jury is free to accept or reject, in part or in total, the testimony of any witness, including alibi witnesses. See *State* v. *Bill*, 146 Conn. 693, 696, 155 A.2d 752 (1959). That is exactly what the jury in the present case did.

As previously discussed, the state introduced Nealey's signed, written statements as substantive evidence. In those statements, Nealey stated that the defendant was involved in the crimes charged and provided details as to his involvement. We have concluded that those statements were admitted properly under the *Whelan* exception to the hearsay rule. Accordingly, the jury was free to decide whether to credit the version of the events contained in those statements or to credit the declarant's testimony from the witness stand.

If the jury chose to credit the declarant's written statements, those statements alone would be sufficient to support the defendant's conviction. See *State* v. *Newsome*, supra, 238 Conn. 617–20 (prior inconsistent statement identifying defendant as perpetrator and admitted as substantive evidence sufficient to establish guilt beyond reasonable doubt where statement possesses ample indicia of reliability). Here, the statements possess sufficient indicia of reliability. They were in writing and were sworn, and the declarant admitted that they

---

[5] The case cited by the defendant, *State* v. *Reid*, 193 Conn. 646, 480 A.2d 463 (1984), stands for the proposition that where the state presents evidence of an attempt by the defendant to fabricate an alibi, that evidence is admissible to show conduct inconsistent with a claim of innocence.

contained the information that he had provided to the police shortly after the robberies occurred. The statements describe the locations and times of the robberies, the declarant's association with the defendant and the declarant's role in the crimes. Moreover, on cross-examination, the prosecution introduced evidence contained in the statements that had not admitted substantively to impeach the credibility of the declarant's claim of fabrication.[6]

In addition, the state presented sufficient circumstantial evidence to support a finding of guilt. Specifically, the defendant was stopped by the police while riding in the car used in the robberies a short time after those robberies had been committed. Williams and Mercado positively identified the car as the one that had been involved in the robberies. Several of the items stolen from the victims were found in the car after it had been stopped by the police. The defendant and his two companions fit the descriptions given to police by witnesses. An eyewitness to the Owen Street robbery positively identified Nealey as the driver of the car, thus corroborating his statement to the police. Shortly before the commission of the crimes, Iverson and the defendant were observed together with chrome colored handguns in their possession. The defendant testified that he spent nearly five months living out of his car to avoid the police, whom he had been told were looking

---

[6] The two statements provided to the police contained, in their entirety, accounts of five robberies. Because the victims of two of those robberies could not be located for trial, the portions of the statements relating to those two robberies were not introduced as substantive evidence. Nevertheless, those statements were introduced to impeach the declarant's credibility regarding the claim that the information in his statements had been "fed" to him by the interrogating police officer. Confronted with the fact that police were not yet aware of the two other robberies at the time that the statements were given, the declarant claimed that the information relating to only three of the robberies had been provided by the police and that the information concerning the remaining two robberies had, in fact, been supplied by himself.

for him. The defendant went so far as to quit his job so that he could not be found. The jury was free to consider that as evidence of consciousness of guilt and to give to that evidence the weight that it deemed appropriate. See *State* v. *Kelly*, 256 Conn. 23, 54, 770 A.2d 908 (2001); *State* v. *Jefferson*, 67 Conn. App. 249, 258, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002); *State* v. *Gilbert*, 52 Conn. App. 531, 543, 727 A.2d 747, cert. denied, 249 Conn. 905, 733 A.2d 224 (1999).

Our review of the record before us indicates that the evidence supports the jury's verdict and was sufficient to convict the defendant of the crimes charged.

The judgments are affirmed.

In this opinion the other judges concurred.