## STATE OF CONNECTICUT *v.* JUAN V.[1]
### (AC 28871)

Bishop, Beach and Berdon, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

432

Argued March 17—officially released July 29, 2008

*Steven L. Seligman*, for the appellant (defendant).

*Sarah Hanna*, deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Juan V., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the trial court made four improper evidentiary rulings and should have granted his motion for a judgment of acquittal on the ground that there was insufficient evidence to sustain the sexual assault conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Between July 5, 2003, and July 4, 2004, the victim, J, spent one to three mornings each week at the house of her grandmother and her grandfather, the defendant, while her parents worked. During this time, J was approximately four years old. Several times, while J was at the defendant's home, the defendant and J engaged in a "game called break-it." The game occurred both in the defendant's bedroom and in the basement, and required that J take off her shirt, pants and underwear.[2] The

---

[2] J testified that she played the game with the defendant at other times when she did not take her clothes off.

defendant would remove his shirt and pants and would then take his "peanut," which J described as "long" with a "circle" and a "hole," out "from a little hole in his pajama pants." Then J would lie on top of the defendant or he would lie on top of her and they would both start "jumping on each other."[3] The defendant "put his peanut in [J's] tolin"[4] and got "white gooey stuff" inside of J's genitalia. After the game was over, the defendant cleaned J's genitalia with a towel and told her to keep the game a secret.

At trial, both J and the defendant testified. Additionally, a significant amount of testimony was provided through the admission of the videotaped diagnostic and forensic interview that was conducted at the children's advocacy center at Saint Francis Hospital and Medical Center (advocacy center) after J complained about the sexual assault. At the trial's conclusion, the jury found the defendant guilty on both charges, and the court sentenced him to the custody of the commissioner of correction for a total effective term of twenty years, suspended after ten years, with twenty years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion by admitting the examining pediatrician's report into evidence. Specifically, the defendant claims that the pediatrician's report contained a statement that impermissibly vouched for J's credibility. We disagree.

---

[3] During a diagnostic and forensic interview at the children's advocacy center at Saint Francis Hospital and Medical Center, J demonstrated with dolls and with her body how she and the defendant moved against each other while they were playing this game.

[4] In the out-of-court statements that were admitted at trial, J used the word "peanut" for male genitalia and "tolin" for female genitalia. At trial, J used the phrase "front private" to describe both male and female genitalia.

At trial, Frederick K. Berrien, a physician, testified for the state that, prior to conducting J's physical examination, he had read a report, prepared by Annabella Agudelo, summarizing J's interview at the advocacy center. Berrien relied on Agudelo's report for J's medical history and to tailor his examination to J's allegations. Although the physical examination of J was normal, Berrien testified that a lack of physical findings does not disprove sexual abuse. Berrien explained that since the assault allegedly took place approximately one month before the examination, there would have been time for damage to J's genitalia to heal. Furthermore, Berrien testified that penetration of the genitalia can occur without entrance as far as the hymen. In the course of Berrien's testimony, the state moved to admit a copy of the report of J's physical examination pursuant to the business record exception to the rule against hearsay. The state established, and the defendant did not dispute, that Berrien prepared the report, that it was prepared in the ordinary course of business and that it was completed at or near the time of the examination.[5] The defendant objected to the following line in the report: "A normal exam can be found with sexual contact as revealed in the interview." The defendant claimed that this sentence amounted to an illegal opinion on an ultimate issue in the case and impermissibly vouched for J's credibility. The report was admitted over the defendant's objections.

"The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The

[5] A business record is admissible if the trial court finds that "it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter." General Statutes § 52-180; *Calcano* v. *Calcano*, 257 Conn. 230, 240, 777 A.2d 633 (2001).

court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Robles*, 103 Conn. App. 383, 401, 930 A.2d 27, cert. denied, 284 Conn. 928, 934 A.2d 244 (2007).

"[A]n expert witness may not testify regarding the credibility of a particular victim." *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001). Our Supreme Court has "found expert testimony stating that a victim's behavior was generally consistent with that of a victim of sexual or physical abuse to be admissible, and ha[s] distinguished such statements from expert testimony providing an opinion as to whether a particular victim had in fact suffered sexual abuse. . . . [E]ven indirect assertions by an expert witness regarding the ultimate issue in a case can serve inappropriately to validate the truthfulness of a victim's testimony." (Citation omitted.) *State* v. *Iban C.*, 275 Conn. 624, 635, 881 A.2d 1005 (2005).

Here, the defendant asserts that the phrase, "as revealed in the interview," constitutes Berrien's opinion that J's interview statements alleging sexual assault were true. In making his argument, the defendant asserts that the phrase at issue in Berrien's report falls into the category of expert opinions deemed to be improper bolstering in *Iban C.* and *Grenier.* We disagree.

The statement in question here is distinctly different from the expert testimony found inadmissible in *Iban C.* and *Grenier.* In *Iban C.*, the defendant objected to the written report and the direct testimony of the state's expert witness, a pediatrician, who diagnosed the victim in that case as having been sexually abused despite a normal physical examination. *State* v. *Iban C.*, supra, 275 Conn. 632–33. On appeal, the Supreme Court found that the testimony under scrutiny usurped the role of the

jury by impermissibly bolstering the victim's credibility. Id., 636–37. In this case, unlike in *Iban C.*, Berrien did not opine that J had been sexually abused; rather, he made the general statement that a normal physical examination is not necessarily inconsistent with sexual abuse.

*Grenier* is likewise distinguishable from the case at hand. In *Grenier*, a counselor's testimony that the victim's " 'statements were very credible' "; *State* v. *Grenier*, supra, 257 Conn. 802; was inadmissible because it amounted to "a direct assertion that validated the truthfulness of [the victim's] testimony." (Internal quotation marks omitted.) Id., 806. Additionally, a clinical psychologist's testimony that she treated the victim for " 'the trauma of the abuse that [she] experienced' "; id., 804; was inadmissible because it "constituted an indirect assertion that validated the truthfulness of [the victim's] testimony." (Internal quotation marks omitted.) Id., 806. In this case, Berrien did not directly or indirectly validate the truthfulness of J's testimony. He simply indicated that a normal examination does not belie the occurrence of sexual abuse.

We agree with the court that the segment of the report at issue did not improperly bolster J's credibility. The statement at issue in Berrien's report was merely a caveat to his conclusion that J's physical examination was normal. It did not validate or credit the statements J made in her interview with Agudelo. Accordingly, we conclude that the court did not abuse its discretion by admitting Berrien's report.[6]

---

[6] While we respect the right of our colleague, Judge Berdon, to voice his opposition, we are concerned that the dissent contains a significant misstatement of a core evidentiary issue and that it contains a conclusion about an individual that finds no support in the record. As to the former, the dissent asserts that the written report by Berrien states: "A normal exam can be found with sexual contact *as revealed in the interview* [with Agudelo]," followed by the notation, "(Emphasis added.)." The dissent fails to acknowledge that the bracketed phrase, "[with Agudelo]," is a creation solely of the dissent and can be found nowhere in the record. This point is

## II

Next, the defendant claims that the court improperly permitted the state to bolster J's credibility on direct examination. Specifically, the defendant argues that the state's question, "Did you know you were supposed to tell the truth to [Agudelo]?" and J's affirmative response vouched for her credibility before the defendant had put her credibility at issue on cross-examination. We disagree.[7]

significant because the addition of the phrase, "[with Agudelo]," lends support to the defendant's claim that Berrien's comment was not a general statement that a normal examination can be consistent with sexual abuse as revealed in the interview that usually precedes his physical examination but, rather, that Berrien was speaking, not in general terms, but specifically about his interview of the victim in this case and was affirming that sexual abuse did, in fact, take place in this instance. The inclusion of the comment, "[with Agudelo]," within the quotation from Berrien's report effectively changes the witness' testimony from a general statement to a specific one. That conflation is not supported by the record. Our task on appeal is not to create the record at trial but, rather, to make legal and just determinations on the basis of the record as it comes to us.

A variation of this problem arises in footnote three of the dissent in which Judge Berdon comments: "It is obvious that because the state relied on this interview to prosecute the defendant, and Agudelo's employer, the advocacy center, was financed in part by the office of the chief state's attorney, Agudelo acted, at least in part, in the role of a prosecutor in the interview." Aside from the obvious impediment that we ought not to be engaging in fact-finding on review, the record is devoid of any support for this factual leap. To the contrary, the record reveals that Agudelo, as a clinical child interview specialist, acted as part of an interdisciplinary team to interview the victim and that her purpose in doing so was to "gather as much accurate information as possible to make decisions for medical and other mental health services." Additionally, the record is clear that the victim, who was aware that she was in the hospital when the interview took place, thought Agudelo was a physician and was there to help her. Although our colleague may be troubled by the notion of a multidisciplinary team approach to the interviewing of a child, one that may have both criminal investigative as well as medical care purposes, the record in this case lends no support to the notion that everyone who participates in such an interview must be an agent of the prosecution simply because this team approach is financially supported, in part, by the prosecutorial arm of the state.

[7] The state argues that this claim was inadequately briefed and that we should decline to afford it review. See *Connecticut Coalition Against Mill-*

Because the defendant is challenging an evidentiary ruling, our standard of review is whether the court abused its discretion in permitting the testimony. *State* v. *Robles*, supra, 103 Conn. App. 401. Evidence that bolsters a witness' credibility before it has come under attack is prohibited. Conn. Code Evid. § 6-11 (a); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.27.2 (a), p. 342 (discussing prohibition of "[e]vidence accrediting or supporting a witness's honesty or integrity [before] the witness's credibility has first been attacked").

The following additional facts from the trial are pertinent to this issue. At the beginning of the direct examination of J, the state asked:

"Q. Do you remember going to a hospital and talking to a lady named [Agudelo]?

"A. Yes.

"Q. And did you tell her things that happened also?

"A. Yes.

"Q. And the things that you told her, were they true?

"A. Yes."

The defendant objected to the final question and answer on the ground that the state was improperly attempting to bolster the witness' credibility. The court agreed to strike the question and answer from the record. Thereafter, as the direct examination of J continued, she related many of the details of the alleged assault; however, some details differed, in particular regarding the issue of penetration, from statements she had made during her videotaped interview with Agudelo at the advocacy center. The following exchange, which is the heart of this claim, ensued:

*stone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008). We believe the analysis is sufficient for review.

"Q. And you talked to [Agudelo] about what happened. Right?

"A. Yes. . . .

"Q. And when you were—when you were telling [Agudelo] those things, did you know that you were supposed to tell the truth then?

"[Defense Counsel]: Objection, Your Honor. It improperly seeks to bolster the credibility of an unimpeached witness.

"[The Prosecutor]: No. I'm seeking to lay a foundation in the terms of a six year old.

"The Court: I'll allow it.

"Q. Did you know that you were supposed to tell the truth to [Agudelo]?

"A. Yes."

The court did not abuse its discretion in permitting the state to ask J whether she knew she was supposed to tell the truth during her interview with Agudelo because it is reasonable to conclude that the state was attempting to lay a proper foundation for admissibility of the videotape. Shortly after the court permitted the question at issue, the state concluded its direct examination of J and informed the court that it was going to seek to introduce portions of the videotaped interview under the *Whelan*[8] and past recollection recorded exceptions to the rule against hearsay. Both of these exceptions to the rule against hearsay require the moving party to show that the out-of-court statements were

---

[8] *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

reliable.[9] Consequently, it was reasonable for the court to conclude that the state's question was not intended to bolster the veracity of J but, instead, was part of the state's effort to lay the requisite foundation for admissibility of the videotaped interview.

Furthermore, the state's question about whether J knew she was supposed to tell the truth during the interview is readily distinguishable from the impermissible and previously stricken question of whether she was, in fact, telling the truth. The latter is an improper invasion of the province of the jury, as it seeks to bolster J's credibility before it has come under attack. In contrast, the former seeks to discern the state of mind of the witness during the interview as a prelude to the admissibility of the videotaped interview.

## III

The defendant next claims that the court abused its discretion by admitting portions of the videotaped interview of J pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Specifically, the defendant claims that the state failed to prove that J had personal

[9] Under the *Whelan* exception, "the linchpin of admissibility is reliability: the [*Whelan*] statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process." *State* v. *Muhktaar*, 253 Conn. 280, 306–307, 750 A.2d 1059 (2000).

Connecticut Code of Evidence § 8-3 (6) defines the past recollection recorded exception as "an event about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness at or about the time of the event recorded and to reflect that knowledge correctly." Proving that the record was accurate at the time it was made is an essential element of this exception. See *State* v. *Whelan*, supra, 200 Conn. 746 n.3 ("[b]ecause the [declarant] was unable to vouch for the accuracy of the statement, it could not be admitted under the past recollection recorded exception to the hearsay rule").

knowledge of the contents of the videotape, and, therefore, her availability for cross-examination was meaningless. The defendant's argument is without merit.

The following additional facts are relevant to our disposition of the defendant's claim. After J reported being sexually assaulted by the defendant, she provided a detailed account of the assaults in a videotaped interview with Agudelo at the advocacy center. J related many of the details of the sexual assaults in her testimony at trial; however, when asked, "[D]id his front private go inside or outside your front private?" she replied, "Outside." Additionally, when asked, "Did his front private go in your front private?" J responded, "No." These assertions were inconsistent with the details J provided in the videotaped interview. As a result, the state sought to admit segments of the interview that were inconsistent with her trial testimony under the *Whelan* exception to the rule against hearsay. The defendant objected, arguing that because J could not recall the substance of her prior videotaped statements, she had no personal knowledge of them; and her lack of memory would deny the defendant meaningful cross-examination. The court overruled the objection and permitted segments of the interview into evidence pursuant to *Whelan*.

"The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the . . . discretion of the trial court. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); accord *State* v. *Saucier*, 283 Conn.

207, 217–18, 926 A.2d 633 (2007) (en banc) (adopting "hybrid" approach to review of hearsay claims and concluding that "[w]e review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion"). In *Whelan,* our Supreme Court adopted "a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." *State* v. *Whelan,* supra, 200 Conn. 753.

"As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true in fact. But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment." (Internal quotation marks omitted.) *State* v. *Watkins,* 72 Conn. App. 804, 810, 806 A.2d 1072 (2002), cert. denied, 263 Conn. 923, 823 A.2d 1216 (2003).

The defendant does not contest that the admitted portions of the videotaped interview were inconsistent with J's trial testimony or that the process of videotaping satisfied the writing requirement. Rather, the defendant asserts that the witness lacked personal knowledge at the time of trial of the accuracy of her videotaped statements.

"In evaluating whether a declarant has personal knowledge of the facts contained within a prior inconsistent statement, we look to the statement itself. If the statement itself indicates that the basis of the information contained in that statement is the declarant's personal knowledge, that is sufficient to satisfy the criteria of personal knowledge established by *Whelan.*" Id., 812.

In this case, through an interview, J related events that happened directly to her. This interview was captured on a videotape. The jury was shown the actual tape. Despite the obvious demonstration that J had personal knowledge of the facts that she related in the videotaped interview, the defendant argues that her inability to remember some of the interview at trial rendered her lacking in personal knowledge. Whether a witness repudiates a prior inconsistent statement has no bearing on the reliability of such statement. See *State* v. *Woodson*, 227 Conn. 1, 21, 629 A.2d 386 (1993). Furthermore, "[a]llowing a party to circumvent the exception to the hearsay rule established by *Whelan* merely by repudiating the foundation for his knowledge when that foundation is an element of the statement itself would eviscerate the *Whelan* exception, potentially leaving no statement admissible under the pertinent rule." *State* v. *Watkins*, supra, 72 Conn. App. 812.

As to the defendant's claim that J's faulty memory deprived him of meaningful cross-examination, we are unpersuaded. J was in court, testified as to her ability to distinguish between the truth and a lie, and was available to respond to the defendant's questions. See *United States* v. *Owens*, 484 U.S. 554, 561, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988). The defendant was able to avail himself fully of the opportunity to cross-examine J about the inconsistencies between her testimony and the videotaped interview. Her inability at trial to remember certain details about the interview does not render her unavailable for cross-examination. "[Meaningless cross-examination] is not produced by the witness' assertion of memory loss—which . . . is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement." Id., 562; *State* v. *Pierre*, supra, 277 Conn. 81. We conclude that the court did not abuse its discretion by admitting segments of the videotaped interview pursuant to *Whelan*.

## IV

The defendant also asserts that the entire videotaped interview was admitted improperly by the court under the medical treatment exception to the rule against hearsay. The defendant contends that because J was not suffering from any physical symptoms, the state failed to prove that J knew that she was providing a statement for the purpose of medical treatment. We disagree.

The following additional facts are pertinent to the defendant's claim. After J reported the alleged sexual abuse to her parents, her father consulted with members of his church about her complaints. Thereafter, the police received a report of the sexual abuse and sent an officer and an investigator from the department of children and families to speak with J. On May 24, 2004, J was brought to the advocacy center for a diagnostic and forensic interview with the social worker, Agudelo.[10] J was shown the interview room as well as an adjoining room, and she was told that there would be people, including a police officer, in the adjoining room.

After the interview, Agudelo made recommendations to J's family concerning J's future care and provided details of the interview for the examining pediatrician, Berrien. Berrien testified that the purpose of his examination was to determine if J needed further medical treatment. In addition, he relied on the details provided by Agudelo in order to understand J's medical history and to inform his physical examination.

At trial, portions of the videotaped interview were admitted under the *Whelan* exception to the rule against hearsay, but the state sought to introduce the entire videotape pursuant to the medical treatment exception

[10] Agudelo testified that at the time of the witness' interview, she was employed as a "clinical child interview specialist," and she also testified that her educational background includes a master's degree in social work.

to the rule against hearsay. To this end, the state elicited testimony from J that she knew that the interview with Agudelo occurred at a hospital and that she thought Agudelo was a physician. J testified that she had been examined by two physicians, Agudelo and a man, who both "checked me [to see] if there was anything wrong." The defendant objected, inter alia, to the state's offer on the ground that the state had failed to prove that the statements were made by J for the purpose of obtaining medical treatment. The court admitted the entire video-tape over the defendant's objections.

To the extent that a court admits evidence relying on an interpretation of the Connecticut Code of Evidence, our review is plenary; but here, where the court's decision was an application of the facts to the law, we afford the trial court's ruling deference and will only reverse for an abuse of discretion. See *State* v. *Saucier*, supra, 283 Conn. 218–20.

Section 8-3 (5) of the Connecticut Code of Evidence (2000) contains an exception to the hearsay rule for "[a] statement made for purposes of obtaining medical treatment or advice pertaining thereto and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical treatment or advice." "Regardless of whether the statements were made to a physician, they must all have been made in furtherance of medical treatment." (Internal quotation marks omitted.) *State* v. *Slater*, 285 Conn. 162, 186, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). In fact, the medical treatment exception is not limited to physicians and has been extended to include social workers, as long as the social worker is found to have been "acting within the chain of medical care . . . ." *State* v. *Cruz*, 260 Conn. 1, 10, 792 A.2d 823 (2002). "Although [t]he medical treatment exception to

the hearsay rule requires that the statements be both pertinent to treatment and motivated by a desire for treatment . . . in cases involving juveniles, our cases have permitted this requirement to be satisfied inferentially." (Citation omitted; internal quotation marks omitted.) *State* v. *Telford*, 108 Conn. App. 435, 441–42, 948 A.2d 350, cert. denied, 289 Conn. 905, 957 A.2d 875 (2008).

The record provides ample basis that J gave the statements to obtain medical treatment. J testified that she was brought to a hospital, she believed Agudelo was a physician and the purpose of the interview was to see "if there was anything wrong." Not only did J believe that she was interviewed for diagnostic purposes, but she did, in fact, receive medical treatment. Agudelo testified that she made recommendations to J's parents after the interview.[11] Furthermore, the interview fell within the chain of medical care because Berrien adapted his physical examination to J's reported experiences. On the basis of this evidence, the court did not abuse its discretion by admitting the entire videotaped interview under the medical treatment exception to the rule against hearsay.

V

Finally, the defendant claims that the court improperly denied his motion for a judgment of acquittal as to the count of sexual assault in the first degree because

[11] The defendant argues that because some of the funding for the advocacy center came from the office of the chief state's attorney, the mission of the advocacy center is more closely aligned with the goals of law enforcement than with the goals of medical treatment. Although the medical treatment exception explicitly requires that the interviewee have the purpose of obtaining medical treatment, we also believe it is implicit in this rule that the interviewer must also have the purpose of providing medical treatment. In this instance, regardless of whatever other purposes this interview protocol may have served, it met the parameters of the exception; J went to the advocacy center for medical treatment, and Agudelo interviewed her to assess her health care needs.

the evidence was insufficient to prove the necessary element of sexual intercourse. Specifically, the defendant contends that the state failed to present any evidence of penetration from which the jury could conclude that he engaged in sexual intercourse with J. We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or

facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007) (en banc).

General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ." The defendant claims that the state failed to prove beyond a reasonable doubt that the defendant engaged in sexual intercourse with J. General Statutes § 53a-65 (2) defines "sexual intercourse," in relevant part as, "vaginal intercourse . . . between persons regardless of sex. . . . Penetration, however slight, is sufficient to complete vaginal intercourse . . . and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital . . . opening of the victim's body." Connecticut follows the common-law least penetration doctrine in that "the phrase '[p]enetration, however slight' . . . was intended to cover penetration of the labia majora." (Citation omitted; internal quotation marks omitted.) *State* v. *Albert*, 252 Conn. 795, 806, 750 A.2d 1037 (2000).

The evidence, when construed in the light most favorable to sustaining the jury's verdict, is sufficient to sustain the defendant's conviction of sexual assault in the first degree. The court admitted segments of the videotaped interview between J and Agudelo under the *Whelan* exception to the rule against hearsay during redirect examination of J. J described the defendant's penetration of her genitalia in her videotaped interview with Agudelo in the following manner:

"Q. So, grandpa took out his peanut. And then what happened? . . .

"A. Grandpa took it out. He had it in a zipper. And he took off his shirt. He took off his pants. And then he had a little hole in his pajama pants. So, he took that out.

"Q. Uh-huh.

"A. And then when I went on top of him, that was gooey.

"Q. It was gooey. What was gooey?

"A. This was a little hole in there that made gooey stuff on it.

"Q. Yeah. A hole in what?

"A. It had a—it had a little hole this small—

"Q. Uh-huh.

"A. —that you can't really see. And what happened is that—oh. I went—I went on him.

"Q. Uh-huh.

"A. He started making me gooey.

"Q. He made you gooey?

"A. Uh-huh.

"Q. Where were you gooey?

"A. Well, he (unintelligible) tolin, [because] I have a tolin. And he put it right in there. So, it got me gooey.

"Q. Yeah. He put what in your tolin?

"A. He put white gooey stuff.

"Q. White gooey stuff? Where did the white gooey stuff come from?

"A. From his peanut. . . .

"Q. So, he put his peanut in your tolin?

"A. Uh-huh.

"Q. What did that feel like?

"A. It feels like something was going on me. And it started sending a lot of gooey.

"Q. A lot gooey?

"A. Yes.

"Q. What was he doing with his peanut in your tolin? What was he doing?

"A. He started jumping around and doing this."

Additionally, on recross-examination, the following exchange took place between counsel for the defense and J:

"Q. Okay. Did you hear yourself say on the tape that grandpa got gooey stuff in your tolin? Did you hear yourself—

"A. Yes.

"Q. —on tape say that?

"A. Yes.

"Q. Do you remember—now that we have seen the tape, do you remember saying that?

"A. Yes.

"Q. Is that true that he got gooey stuff in your tolin?

"A. Yes.

"Q. And how do you know that it was in your tolin? Did you feel something that made you think it was in your tolin?

"A. I think so.

"Q. Okay. What did you feel?

"A. I think it—I think . . .

"Q. [J], did you feel any pain?

"A. No.

"Q. No pain at all? You sure about that?

"A. Yes.

"Q. When I say, 'Did you feel any pain?' I mean, specifically, in your front private part?

"A. No. There was no pain."[12]

We agree with the court that J's testimony reasonably supports the inference that the defendant penetrated J. Specifically, J stated that "he put it right in there," and she responded affirmatively to the question, "So, he put his peanut in your tolin?" Though J testified during direct examination that the defendant did not penetrate her with his "front private," after watching the admitted videotaped segments, she did not give any indication that her videotaped testimony was incorrect. In fact, on recross-examination she confirmed that the

---

[12] We note that Berrien, the examining physician, testified that J's normal physical examination and intact hymen did not disprove the possibility of sexual abuse. He explained that a normal examination does not address the fact that "penetration does not always penetrate as far as the hymen . . . and therefore, there is no damage to the hymen itself, although there can be penetration of the labia, that is, those folds that surround the opening to the genitalia as well as . . . to as the external vagina or vestibule, which is external to the hymen itself."

defendant ejaculated in her and that she thought she felt something inside of her genitalia. Furthermore, to the extent that the jury chose to believe J's videotaped statements rather than her testimony at trial, "[i]t is well settled that [w]hether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . [T]he [jury] can . . . decide what—all, none or some—of a witness' testimony to accept or reject. . . . [Q]uestions of whether to believe or to disbelieve a competent witness are beyond our review . . . ." (Internal quotation marks omitted.) *State* v. *Betancourt*, 106 Conn. App. 627, 632 n.1, 942 A.2d 557, cert. denied, 287 Conn. 910, 950 A.2d 1285 (2008).

The defendant also asserts that Agudelo's question, "So, he put his peanut in your tolin?" was a leading question and, therefore, unreliable.[13] The use of leading questions with children, when appropriate, does not necessarily render their responses untrustworthy. J. Myers, Child Witness Law and Practice (1987) § 4.6, pp. 129–34. Here, the defendant had ample opportunity to cross-examine J about her testimony and to expose weaknesses in her credibility. Ultimately, the determination of what weight to afford particular testimony is the exclusive province of the jury.

---

[13] As part of his claim, the defendant also asserts that J's reliability was tainted because Agudelo gave her a teddy bear just before the videotaped interview began. The defendant cites *State* v. *Aponte*, 249 Conn. 735, 738 A.2d 117 (1999), in support of this argument. We disagree. In *Aponte*, the court concluded that the defendant was deprived of due process because the prosecutor gave the complaining witness a doll prior to testifying and because the court limited the defendant's ability to cross-examine the witness about this impropriety. Id., 737. This case is markedly different from *Aponte* because in this case, the teddy bear was given to J by a social worker before the social worker conducted a diagnostic and forensic interview, and the defendant was permitted to fully cross-examine J about the teddy bear.

Because the jury reasonably could have determined that penetration occurred, we conclude that the court properly denied the defendant's motion for a judgment of acquittal.

The judgment is affirmed.

In this opinion BEACH, J., concurred.

BERDON, J., dissenting. This is a difficult case, not because of the applicable law, but because it involves allegations of sexual assault and abuse of J,[1] a four year old child, allegedly perpetrated by the defendant, Juan V., her grandfather, the thought of which would arouse the emotions of anyone. But we are a nation of laws, and a jury must decide the guilt or innocence of a defendant on the basis of legally admissible evidence. In such cases, it is the duty of this court to rule on claimed errors even when its decision would result in a new trial. In the present case, I believe that the trial court committed error, that the defendant's conviction of sexual assault in the first degree and risk of injury to a child should be reversed and that a new trial should be ordered on both counts.

After the allegations with respect to the sexual abuse of J came to the attention of the East Hartford police department, a police officer brought J to the Saint Francis Hospital and Medical Center's children's advocacy center (advocacy center), a program that is partially funded by the office of the chief state's attorney. At the advocacy center, J was interviewed by Annabella Agudelo, a "clinical child interview specialist." The police officer recorded and observed the interview through a one-way mirror. Although J, in her courtroom testimony, denied penetration, a necessary element of sexual assault in the first degree pursuant to General

---

[1] See footnote 1 of the majority opinion.

Statutes § 53a-65 (2),[2] during this interview, in response to leading questions by Agudelo,[3] a statement was elicited indicating that there was penetration.

Shortly thereafter, Frederick K. Berrien, a pediatrician and the director of the advocacy center, examined J. At trial, Berrien testified that his examination of J revealed no abnormal findings, and the state offered into evidence his written report, which included the following statements under the heading of "Assessment": "The anogenital exam on [J] is normal. A normal exam can be found with sexual contact *as revealed in the interview* [with Agudelo]." (Emphasis added.)[4] Counsel for the defendant timely objected to the admission of the italicized portion of that statement and sought its redaction, arguing that the language improperly vouched for J's credibility. In fact, during the limited argument that counsel was forced to make in the

[2] General Statutes § 53a-65 (2) provides: " 'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse, or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body."

[3] J was given a stuffed animal by Agudelo immediately before the interview commenced, and J was allowed to keep it. It is obvious that because the state relied on this interview to prosecute the defendant, and Agudelo's employer, the advocacy center, was financed in part by the office of the chief state's attorney, Agudelo acted, at least in part, in the role of a prosecutor in the interview. "[T]he principle is well established that serious prosecutorial misconduct, regardless of the prosecutor's intention, may so pollute a criminal prosecution as to require a new trial, even without regard to prejudice to the defendant." *State* v. *Hafner*, 168 Conn. 230, 251, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975).

[4] I am bewildered by the majority's footnote six. First, Berrien referred clearly to "the interview." He did not state "in an interview." I hope that we can all agree that J was interviewed only once at the advocacy center and that this interview was conducted by Agudelo. Second, it is clearly indicated to the reader that I added "with Agudelo" by placing that phrase in brackets. No matter how the phrase is read, Berrien was in essence writing that J's statement in the interview was credible. By doing so, Berrien overstepped the limits imposed on expert testimony and invaded the fact-finding province of the jury.

presence of the jury,[5] counsel was able to refer the court to a Connecticut Supreme Court case that supported his position.[6]

---

[5] The defendant does not raise the claim that the court abused its discretion by failing to excuse the jury from the courtroom, notwithstanding that the court's actions requiring counsel to argue his reasons in front of the jury that such statement be redacted was patently unreasonable and constituted a clear abuse of discretion.

[6] The following colloquy occurred during the prosecutor's direct examination of Berrien:

"[The Prosecutor]: Dr. Berrien, did you perform—I mean, did you write a report in connection with your physical examination of the child in court's exhibit one?

"[The Witness]: Yes, I did.

"[The Prosecutor]: Prepare a report, is what I was trying to say. And I'm showing you, Dr. Berrien, state's exhibit eight for identification. Do you recognize what that is?

"[The Witness]: Yes. It's a copy of my report.

"[The Prosecutor]: And is that prepared in the ordinary course of business?

"[The Witness]: Yes, it was.

"[The Prosecutor]: Is it your ordinary course of business to prepare such a report?

"[The Witness]: Yes, it is.

"[The Prosecutor]: And was it prepared at or near the time of the examination?

"[The Witness]: Yes, it was.

"[The Prosecutor]: I'd offer it as a full exhibit. . . . The history that's indicated in this report—from who did you receive that information?

"[The Witness]: From whom did I receive all of the information?

"[The Prosecutor]: That's included in your report under the section called 'history'.

"[The Witness]: History was in large part obtained from the report of . . . Agudelo.

"The Court: All right. Subject to the name being redacted, I'll allow it in as a full report.

* * *

"[Defense Counsel]: The court has a copy of the report? Under '[a]ssessment,' Your Honor. The assessment, the second sentence, which I'd rather discuss in the jury's absence, because I'm certainly saying—tell you that this is—does not belong in this report and should be excluded.

"The Court: Okay.

"[Defense Counsel]: So—

"The Court: I've read it, [the] state's attorney has read it [and the] doctor has previously testified to it. Your objection is overruled.

"[Defense Counsel]: No, Your Honor. I—excuse me, Your Honor. It's the last phrase as revealed in the interview is vouching—Your Honor, this is very inappropriate for me to make this argument in the jury's presence. It's unfair to the defense. It's unfair to the jury. The—

"[The Prosecutor]: May I be—

"[Defense Counsel]: The doctor appears to be accepting as true and vouching for the truth of what appears in that phrase. . . . Clearly—clearly is

I recognize that the "trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"The determination of the credibility of a witness [however] is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded to their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims. . . . An expert witness ordinarily may not express an opinion on an ultimate

the same error—to permit that would be exactly the same error that the trial court made in [*State* v. *Iban C.*, 275 Conn. 624, 881 A.2d 1005 (2005)], which would be to permit the witness to render an opinion on the ultimate issue in this case. That last phrase—he may say the earlier part about which he has already testified, but it's the last phrase, those one, two, three, four, five words that begins with the phrase, 'as revealed'. That part should be redacted.

\* \* \*

"The Court: Do you object to the phrase being redacted?

"[The Prosecutor]: Yes. He's saying—what he's saying is—

"[Defense Counsel]: Well, Your Honor, what he's saying is precisely what I'm saying this jury should not hear. . . . It's a highly inappropriate way to conduct this argument, Your Honor.

"[The Prosecutor]: And I think I should be able to make my argument.

"[Defense Counsel]: I ask that the jury be excused.

"The Court: Well, what we're really arguing about is Warner's Grammar. At least that's the book we used at Hartford High [School]. And I believe this is the subjunctive. And your objection is overruled. You may have an exception."

issue of fact, which must be decided by the trier of fact."
(Citations omitted; internal quotation marks omitted.)
*State* v. *Iban C.*, 275 Conn. 624, 634–35, 881 A.2d
1005 (2005).

Here, the majority tries to minimize Berrien's state-
ment by characterizing it as a "general statement that
a normal physical examination is not necessarily incon-
sistent with sexual abuse." Berrien, however, did not
write what the majority would like us to believe. He
wrote of the "sexual contact as revealed in the inter-
view" with Agudelo, which, at the very least, was an
indirect assertion that J was telling the truth in her
interview and should be believed. Our Supreme Court
has "noted that even *indirect assertions* by an expert
witness regarding the ultimate issue in a case can serve
inappropriately to validate the truthfulness of a victim's
testimony." (Emphasis added.) *State* v. *Iban C.*, supra,
275 Conn. 635; see also *State* v. *Grenier*, 257 Conn. 797,
806, 778 A.2d 159 (2001). The error of allowing this
statement into evidence was compounded by the fact
that it was in writing and also was made available to
the jury as a full exhibit during its deliberations. To
make matters worse, the court forced defense counsel
to argue his objection regarding the admissibility of
Berrien's statement without first excusing the jury. This
must have underscored for the jury its importance in
this case. The error of bolstering the credibility of J's
statements made during the interview was further exac-
erbated when the court permitted the state to elicit
from J, over the timely objection of the defendant, that
she knew that she had to tell the truth to Agudelo during
the interview.[7]

---

[7] The following colloquy occurred during the prosecutor's direct examina-
tion of J:

"[The Prosecutor]: Okay. And when you were—when you were telling
[Agudelo] those things, did you know that you were supposed to tell the
truth then? . . . Did you know that you were supposed to tell the truth
to [Agudelo]?

"[The Witness]: Yes."

It is clear that "[w]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 56, 905 A.2d 1079 (2006). This requirement is satisfied by showing that "it is more probable than not that the erroneous evidentiary ruling affected the result." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 353, 904 A.2d 101 (2006).

I come to the conclusion that the error was harmful because of the admission of Berrien's report into evidence as a full exhibit, because the court required defense counsel to argue the statement's admissibility in the presence of the jury and because the court allowed the state to elicit from J that she knew that she was required to tell the truth during the interview. Furthermore, because there was no physical evidence of sexual assault or abuse and the only evidence was from J, the case must be characterized as "not particularly strong, especially when the victim is a minor." *State* v. *Ritrovato*, supra, 280 Conn. 57. There was no curative instruction given by the court. Under these circumstances, the admission of Berrien's statement was harmful. Just as in *State* v. *Ritrovato*, supra, 57, because "there was no independent physical evidence of the assault [and abuse] and no other witnesses to corroborate [the victim's] testimony, her credibility was crucial to successful prosecution of the case." Berrien's suggestion that there was "sexual contact as revealed in the interview [with Agudelo]" must have played a significant role in the jury's determination of guilt. I would therefore reverse the judgment of the trial court and order a new trial on both counts.

Accordingly, I dissent.